**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DAVID BRIGHTWELL,

    Plaintiff,

    v.

                                    Civil Action No.:  BAH-23-797

KASAHUN TEMESGEN, M.D.,
ROBERT P. WILLIAMS, M.D.,
NP LUM MAXIMUANGU,

    Defendants.

**MEMORANDUM**

Pending in this civil rights case are Plaintiff David Brightwell's Motions for a Temporary Restraining Order (ECF 11), for "Understanding and [To] Still Be Allowed to Proceed" (ECF 13), for Appointment of Counsel (ECF 24), and for Sanctions (ECF 25).  Also pending is a motion filed by the State Attorney General's Office[1] to Seal an exhibit attached to its Response to Show Cause (ECF 19), as well as a Motion to Dismiss or, in the alternative, for Summary Judgment filed by Defendants Kasahun Temesgen,[2] Robert P. Williams, and Lum Maximuangu (collectively "Medical Defendants") (ECF 22).  Despite being warned by the Court of the risks of not responding to a dispositive motion (ECF 23), Brightwell did not respond to ECF 22 and the time to do so has long passed.  Thus, all pending matters have been adequately briefed and the Court finds a hearing unnecessary.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons stated below

---

[1] Though the State of Maryland was not technically sued in this case, the Attorney General of Maryland entered the case as an interested party (ECF 16) after this Court directed the Office of the Maryland Attorney General Correctional Litigation Unit to respond to an Order to Show Cause (ECF 12).

[2] Dr. Temesgen is improperly named as "M.D. Temesgen Kasahun" in the complaint and on the docket.  The Clerk will be directed to correct the spelling of Dr. Temesgen's name as it appears in the caption of this opinion.

Brightwell's motions shall be denied, the Motion to Seal shall be denied, and the Medical Defendants' motion, construed primarily as a Motion for Summary Judgment, will be granted.

## I.    BACKGROUND

### A.    Brightwell's Allegations[3]

Brightwell is incarcerated in Jessup Correctional Institution ("JCI") in Jessup, Maryland. ECF 1, at 1. He filed this complaint pursuant to 42 U.S.C. § 1983 essentially alleging that his Eighth Amendment right to remain free from cruel and unusual punishment is being violated because Medical Defendants have denied him access to pain relieving medications.[4] *Id.* at 9–11. He explains that on March 28, 2021, he asked Dr. Robert P. Williams to increase his pain medication "back to 800 mg . . . three (3) times a day." *Id.* at 8 ¶ 7. According to Brightwell, Dr. Williams told him that "Temesgen MD Kasahun [has] got it out for [him] and told [Dr. Williams] not to increase [Brightwell's] pain medication dosage." *Id.* at 8–9 ¶ 7 (internal quotation marks omitted). When Brightwell asked why the dosage had been reduced from the requested 800 mg, he claims that Dr. Williams told him he "was lucky" to have a prescription of 600 mg three times daily. *Id.*

---

[3] The allegations in this case are found in Brightwell's complaint, ECF 1, which he filed on March 31, 2023. The docket reflects that several months later, Brightwell attempted to file an Amended Complaint without leave of the Court. *See* ECF 5. That filing was marked as "filed in error" after Brightwell alerted the Court by letter that he did not intend to file an amended complaint in this case, but instead wished to file a separate lawsuit with allegations independent of those alleged here. *See* ECF 9.

[4] Brightwell raises pendent state law claims of malpractice. ECF 1, at 8 ¶ 2. As noted below, *see infra* note 14, Brightwell also nominally raises claims under "the First, Fifth, . . . Fourteenth etc., Amendment[s] of the United States Constitution," ECF 1, at 1. For the reasons stated in footnote 14, the Court dismisses these claims claim pursuant to Fed. R. Civ. P. 12(b)(6).

Brightwell claims that Dr. Williams wrote a false medical report that was placed in his medical records stating that Brightwell has a psychiatric disorder and type 2 diabetes mellitus. ECF 1, at 9 ¶ 8.  Brightwell disputes that he has a psychiatric disorder.  *Id.*

On February 16, 2023, Dr. Temesgen met with Brightwell.  ECF 1, at 9 ¶ 10.  After Brightwell was told that his pain medication could be increased back to 800 mg three times per day if he submitted to a blood draw, Brightwell alleges he agreed to allow medical staff to take a blood sample.  *Id.*  In anticipation of Brightwell's cooperation, Dr. Temesgen increased Brightwell's dosage to 800 mg three times per day.  *Id.*

The following day Brightwell was called back to the medical department for the blood draw.  ECF 1, at 9–10 ¶ 11.  At that time Brightwell states that "he had thought about it and did not like the idea that Kasahun Temesgen, MD had only stated to increase the pain medication to 800 mg three times a day for only a few days and [Brightwell] again refuse[d] to have his blood drawn."  *Id.*  The Physician's Assistant ("PA") on duty at that time informed Brightwell that the doctor had instructed that he would not speak with Brightwell and if Brightwell did not consent to the blood draw, he would be taken off the pain medication.  *Id.*

On February 18, 2023, Brightwell was seen by Lum Maximuangu, RNP for a chronic care clinic visit.  ECF 1, at 10 ¶ 13.  Brightwell claims that Maximuangu "conspired with" Dr. Temesgen, *id.*, but does not explain what the alleged conspiracy involved.  Maximuangu told Brightwell that Brightwell's blood test that was performed "a couple of days ago" and indicated that Brightwell's "diabetes was very high."  *Id.*  She advised that after the prescription for 800 mg three times a day had "run its course," and "thereafter put [Brightwell] back 600 mg three times a day."  *Id.*

On February 23, 2023, Brightwell learned that his prescription was changed to 600 mg two times a day.  ECF 1, at 10 ¶ 14.  Brightwell concludes that changing his pain medicine by decreasing the dosage represented an "outright conspiracy done by [Dr. Temesgen]" and that it "is in out-right violation of the American Medical Practice."  *Id.*

Brightwell asserts that the alleged malicious and sadistic actions of Dr. Temesgen violated "the First, Fifth, Eighth, Fourteenth etc., Amendment of the United States Constitution."  ECF 1, at 11 ¶ 16.  He adds that Dr. Williams and Maximuangu agreed with the change in his medication, though both knew it was "out-right wrong," and therefore conspired with Dr. Temesgen to violate his rights.  *Id.* ¶¶ 17, 18.

As relief, Brightwell seeks a declaratory judgment stating that his constitutional rights were violated and demands that the FBI do a full investigation into when he had blood drawn last.  ECF 1, at 12 ¶ A.  He adds that he wants the Court to order a blood draw by someone who is not employed by the Division of Corrections and does not "deal with the [Medical Defendants]."  *Id.* He also seeks an injunction requiring the Medical Defendants to allow the investigation and blood draw.  *Id.* ¶ B.  Lastly, Brightwell seeks compensatory and punitive damages.  *Id.* at 12–13 ¶ C.

**B.    Defendants' Response**

Medical Defendants provide medical records[5] documenting Brightwell's treatment for several chronic medical conditions which include high blood pressure, high cholesterol, Type-2

---

[5] Defendants attached 284 pages of medical records to their motion as "Exhibit A-1."  *See* ECFs 22-3 through ECF 22-10.  The records are docketed as separate attachments, seven of which are 35 pages and one that is 39 pages.  Throughout this opinion the records will be cited as they appear on the docket with reference to their respective ECF docket numbers and the ECF-generated page numbers at the top of each page.  When citing to Dr. Temesgen's statement, the Court will cite to specific paragraphs within that document.

diabetes mellitus, chronic kidney disease, a left eye cataract,[6] and chronic pain syndrome.  ECFs 22-3 through ECF 22-10.  Defendants also attach a sworn declaration by Dr. Temesgen, which essentially summarizes Brightwell's medical records and to which the Court will frequently cite for convenience.  ECF 22-2, at 1–18.  Dr. Temesgen alleges that Brightwell's complaints involve chronic lower back pain, neck pain, and right arm pain due to a gunshot wound.  *Id.* at 2 ¶ 5. According to Dr. Temesgen, Brightwell has "a well-documented history of non-compliance with his medical care that includes refusal to take medications for his diabetes and refusing to have blood drawn for lab tests since February 5, 2021." *Id.*  The pain medication Brightwell refers to in his complaint is Gabapentin, also known as Neurontin.[7]  *Id.* ¶ 4.  Dr. Temesgen states that the dosage Brightwell received was initially prescribed for 800 mg three times per day.  *Id.*  The dosage was reduced because Brightwell has refused to cooperate with receiving a kidney function test.  *Id.* ¶ 5.  Dr. Temesgen asserts that Gabapentin cannot be prescribed to someone of Brightwell's age (72 years old) who has had an abnormal kidney function test in the recent past.  *Id.* at 2–3 ¶ 5. Although Brightwell has been repeatedly told that renewing the Gabapentin prescription without lab work to check his kidney function is not safe, Dr. Temesgen asserts that Brightwell continues to refuse to take those tests.  *Id.*

To the extent that Brightwell alleges that false information was placed in his medical file indicating Brightwell is diabetic, Dr. Temesgen states that when Brightwell was told he was diabetic on April 27, 2021.  ECF 22-2, at 4 ¶ 11.  Nurse Practitioner Bernard Alenda informed

---

[6] In a separate lawsuit Brightwell claims he has not received appropriate treatment for his cataract. *See Brightwell v. Kasahun, et al.*, Civ. No. BAH-23-3189 (D. Md. filed Nov. 29, 2023).

[7] Throughout this opinion the medication will be referred to as Gabapentin.

Brightwell that his A1C[8] was 7.8, which indicates diabetes.  *Id.*  At that time, Brightwell was not taking medication to control his diabetes and refused to "use the stool guaiac cards for occult blood test due to what [Brightwell] called 'religious reasons.'"  *Id.*; *see also* ECF 22-9, at 1, 5.

When Dr. Williams saw Brightwell for chronic care on July 24, 2021, Brightwell was informed that he had "multiple labs showing elevated A1C levels but [Brightwell] steadfastly refused to take diabetes medications and stated he did not have diabetes."  ECF 22-2, at 5 ¶ 13. Brightwell repeated his request to have his Gabapentin increased from 1800 mg/day to 2400 mg/day but Dr. Williams explained that the pharmacist and Dr. Temesgen decreased the dosage because of the concern over Brightwell's kidney function.  *Id.*  After Brightwell's request regarding Gabapentin was denied, he asked Dr. Williams to reduce by half his medications for high cholesterol, triglycerides, and high blood pressure.  *Id.*  That request was also denied.  *Id.*; *see also* ECF 22-8, at 25–27.

On October 31, 2021, Dr. Williams saw Brightwell again for chronic care.  ECF 22-2, at 6 ¶ 16.  At that time, Brightwell continued to refuse medications to treat his diabetes and refused to have his blood drawn.  *Id.*  Brightwell requested his Gabapentin dose be adjusted upward and was again informed this would not be done given his refusal to allow a blood draw.  *Id.*; *see also* ECF 22-8, at 6–7.  Dr. Williams noted in Brightwell's medical records that Brightwell may have a psychiatric disorder because of the steadfast refusal to take diabetes medication and due to Brightwell's denial that he had diabetes "when he had been presented with medical evidence demonstrating that he did have the disease."  ECF 22-2, at 6 ¶ 17.  "The patient's refusal to accept

---

[8] The A1C test can be used to diagnose diabetes and its results are reported as a percentage.  *See What is the A1C Test?*, Am. Diabetes Ass'n (last visited July 30, 2024), available at https://diabetes.org/about-diabetes/a1c.  The higher the percentage, the higher blood glucose levels over the past two to three months.  *Id.*  An A1C level of 6.5% or higher is considered to be "in the diabetes range."  *Id.*

and acknowledge this diagnosis," as Dr. Temesgen recounts, "did suggest some sort of psychiatric disorder." *Id.*

On November 15, 2021, Brightwell had a "pain panel conference" with Dr. Temesgen, Dr. Williams, the pharmacist, and the chronic care nurse. ECF 22-2, at 6 ¶ 18. Brightwell was once again insisting that his Gabapentin be increased to 2400 mg per day from 1800 mg per day. *Id.* The panel explained to Brightwell the risks of a higher dosage in a patient, like Brightwell, who has chronic kidney disease. *Id.* at 7 ¶ 18. Suggestions for an addition of Cymbalta or the use of a lidocaine patch were rejected by Brightwell. *Id.* Dr. Williams requested a behavioral health evaluation to determine whether Brightwell had a "mental disorder" that may explain why refused to cooperate with diabetes treatment and kidney function testing. *Id.*; *see also* ECF 22-7, at 32–36.

On December 2, 2021, Brightwell was seen by LCPC Meaghan O'Reilly for a behavioral health evaluation. ECF 22-2, at 7 ¶ 19. O'Reilly reviewed Brightwell's chart and noted he had no history of psychiatric disorders and had not been prescribed psychotropic medications. *Id.* She concluded that "there was no clear indication of any psychological issues and [Brightwell] did not appear to have any mental health history." *Id.* Her encounter with Brightwell occurred while he was lying on his bunk inside his cell. ECF 22-7, at 29–30. O'Reilly noted that after she introduced herself, Brightwell stopped responding to anything she said and "a mental status exam could not be completed." *Id.*

On January 16, 2022, Brightwell was again seen for a chronic care appointment. ECF 22-7, at 24–26. The Nurse Practitioner, Motunrayo Adegorusi, noted that Brightwell exhibited "symptoms of glucose intolerance" such as "black areas of skin, knuckles, knees, and elbows." *Id.* at 24. At that time, Brightwell's "most recent A1C was 7.8." *Id.* When Adegorusi advised

Brightwell of the complications that can occur when diabetes is left untreated, Brightwell stated he would "cut down on consuming sweets but [would] not take diabetic medications." *Id.* Brightwell assured Adegorusi that if he was given Gabapentin at the 800 mg dosage, he would consent to have lab tests done. *Id.* Brightwell later "vehemently demand[ed that] his [Gabapentin] dose be increased to 800 mg." *Id.* Brightwell was told that 800 mg of Gabapentin three times a day "is not therapeutic for him as his diabetes is not being managed per his choice." *Id.* The dosage Brightwell was receiving, 600 mg three times a day, was continued. ECF 22-7, at 22; *see also* ECF 22-2, at 7–8 ¶ 21.

During his April 10, 2022, chronic care appointment with Dr. Williams, Brightwell again refused to submit to treatment for diabetes, to take medication for his high blood pressure, or to have his blood drawn unless his Gabapentin dosage was increased. ECF 22-7, at 8. Because numerous care providers had previously discussed the Gabapentin dosage issue with Brightwell, Dr. Williams declined to discuss it again at this visit. *Id.* The prescription for Gabapentin at 600 mg three times a day was continued by Dr. Williams (and approved by Dr. Temesgen). *Id.* at 6–7; *see also* ECF 22-2, at 8 ¶ 23.

On June 13, 2022, Brightwell was brought to medical by correctional officers for a fingerstick check. ECF 22-6, at 33–34. The fingerstick showed "Hi" as the result, indicating hyperglycemia, but Brightwell refused to take insulin. *Id.* at 33. At the time, Brightwell's blood pressure was very low (96/61) and he was sweating heavily. *Id.*; *see also* ECF 22-2, at 9 ¶ 24. Brightwell was seen by a provider who ordered "glipizide 5 mg," which Brightwell took as ordered. ECF 22-2, at 9 ¶ 24.

On July 27, 2022, Brightwell was seen again for chronic care. ECF 22-6, at 15–18. He appeared to be in compliance with his diabetes care as he reported taking Glipizide twice a day

and told the provider that he "tries to stay away from sweet and high carb food." *Id.* at 15. Brightwell acknowledged that his renal function was "not good" but still insisted that his Gabapentin dosage be increased. *Id.* Dr. Hamid Kiabayan explained that it is not safe to increase the dosage of Gabapentin when his renal function is impaired. *Id.* Brightwell told Dr. Kiabayan that if his Gabapentin dose is not increased, he will continue to refuse blood tests. *Id.* Dr. Kiabayan explained that if there are no blood tests done and thus "no clear idea about his renal function," Brightwell's Gabapentin will have to be "put on hold." *Id.* Dr. Kiabayan ordered lab tests and prescribed Gabapentin 600 mg three times a day which was approved by Dr. Temesgen. ECF 22-6, at 20; *see also* ECF 22-2; at 9 ¶ 26.

On October 27, 2022, Dr. Kiabayan saw Brightwell again and noted that Brightwell had again refused the requested blood tests in August. ECF 22-6, at 5–8. Despite this non-compliance, Brightwell again asked for his Gabapentin dose to be increased. *Id.* Brightwell also declined to start a new medication for his high blood pressure or to have his current medication increased, even though his blood pressure was not well controlled with his current medication. *Id.*; *see also* ECF 22-2, at 9–10 ¶ 27. Dr. Kiabayan again explained the safety concern regarding an increased dose of Gabapentin and explained the need for bloodwork so that Brightwell's renal function and diabetes could be evaluated. ECF 22-2, at 9–10 ¶ 27. Brightwell nonetheless refused the bloodwork. ECF 22-6, at 10; ECF 22-9, at 30–31. Brightwell's prescription for Gabapentin 600 mg three times per day was continued. ECF 22-6, at 11–12. Records reflect that Brightwell refused the blood work again on February 15, 2023. ECF 22-10, at 15.

On February 16, 2023, a telemedicine appointment was held with Brightwell, the pharmacist, the chronic care nurse, two other providers, and Dr. Temesgen "to discuss pain management." ECF 22-2, at 10 ¶ 32; *see also* ECF 22-5, at 20–22. Brightwell repeated his request

to have his Gabapentin dose increased to 800 mg and was again denied the increase because of his renal function impairment. *Id.* Brightwell expressed fear regarding the blood test, stating that "he is afraid that he might be infected with COVID 19 virus." ECF 22-5, at 20. Brightwell was educated on the manner in which the virus is transmitted, and he agreed to the blood test, but on the condition that he could be put back on the 800 mg dosage of Gabapentin. *Id.* In light of his affirmation that he would submit to the blood test the following morning, Brightwell's prescription was temporarily increased to 800 mg, three times per day for seven days. *Id.* at 23. However, despite his assurances, records reflect that Brightwell again refused to have his blood drawn. ECF 22-2, at 11 ¶ 32; ECF 22-10, at 14. As a consequence of this refusal and the possibility of "long-term complications of kidney damage and retinal damage,"[9] Brightwell's Gabapentin prescription was decreased to 600 mg three times a day. ECF 22-2, at 11 ¶ 33; ECF 22-5, at 13–16.

On February 27, 2023, a telemedicine conference was held to discuss reducing Brightwell's Gabapentin dose. ECF 22-5, at 8–10. The records note that the last blood test result for Brightwell was two years old and that he again refused to submit to an updated blood test to determine both his kidney function and liver function. *Id.* at 8. "Based on his last measured renal function, [Brightwell's] recommended dose was 300 mg," three times a day. *Id.* at 8–9; ECF 22-2, at 11–12 ¶ 34. Accordingly, the medication was to be tapered down over a four-week period to that dose. ECF 22-2, at 11–12 ¶ 34; *see also* ECF 22-5, at 6–7, 9 (implementation of taper).

On March 29, 2023, Brightwell was seen by Dr. Yonas Sisay for chronic care. ECF 22-4, at 31–33. Brightwell told Dr. Sisay he did not want to get any testing, nor did he want a diabetic diet; rather, he complained about being "sore all over" due to not receiving the right amount of

---

[9] The Court notes that this reference to "retinal damage" may be a typographical error; it seems more likely that the record should note a concern of "renal damage."

Gabapentin to address his pain.  *Id.* at 31.  Brightwell told Dr. Sisay he would submit to a new A1C test if he is prescribed Gabapentin at 800 mg three times a day.  *Id.*  Dr. Sisay ordered Gabapentin at the dose requested by Brightwell.  *Id.* at 28; *see also* ECF 22-2, at 12 ¶ 36.  However, according to Dr. Temesgen, Brightwell refused the test, ECF 22-2, at 12 ¶ 36, and no records reflect that a blood draw was taken on or around that date.  On July 5, 2023, Brightwell again refused a blood draw.  *Id.* at 14 ¶ 43.

On August 11, 2023, Brightwell was seen by Maximuangu for a chronic care visit and again refused a blood test, stating that he "does not trust" medical staff.  ECF 22-3, at 30.  In response to his request for a refill of his Gabapentin prescription, Brightwell was told that he needed "a kidney function test for medications to be safely provided" due to his age and the last kidney function result obtained in 2021.  *Id.*  Maximuangu told Brightwell about the risks, including stroke and possible death, if Brightwell continued to refuse to take the requested tests.  *Id.*  Brightwell attempted to bargain with Maximuangu by promising to do the bloodwork if she gave him the Gabapentin he was requesting.  *Id.*  Brightwell also threatened to sue medical staff "for not prescribing [Gabapentin]."  *Id.*; *see also* ECF 22-2, at 15 ¶ 45.  Maximuangu ordered lab tests and prescribed Gabapentin 800 mg three times per day for 30 days.  ECF 22-3, at 29, 31.  No records were provided reflecting either the results of this test or noting whether Brightwell, as had been the case numerous times before, refused to have his blood drawn.

On November 9, 2023, Brightwell was seen by Dr. Michael Agonafir after complaining of poor vision.  ECF 22-3, at 13.  He was prescribed Gabapentin 800 mg, to be taken two times a day.  *Id.* at 12–16.  Dr. Agonafir noted Brightwell's history of uncontrolled diabetes with diabetic neuropathy and chronic kidney disease, and counseled Brightwell to follow up with lab tests, take required medications, and maintain an appropriate diet.  ECF 22-2, at 16 ¶ 48.  Brightwell agreed

11

to have blood drawn the next day, but when the time came for the test, Brightwell refused to participate.  ECF 22-3, at 17.

On December 20, 2023, Brightwell reported to Maximuangu that he needed to have his medications refilled and asked that his Gabapentin be increased from twice a day to three times a day.  ECF 22-10, at 32–34.  Maximuangu noted that Brightwell would need to be seen by a primary care provider to discuss his Gabapentin dose.  *Id.*; *see also* ECF 22-2, at 17 ¶ 50.

On January 17, 2024, Brightwell was seen by CRNP Ikanke Edem and reported worsening pain.  ECF 22-10, at 25.  Brightwell attributed the increase in pain to his Gabapentin dosage being reduced to twice a day instead of three times a day.  *Id.*  Edem noted that Gabapentin had been prescribed at 800 mg twice a day through March 7, 2024, and made no changes to that dosage and schedule.  *Id.*; *see also* ECF 22-2, at 17 ¶ 51.

Dr. Temesgen concludes his sworn affidavit with the following statement:

> I have never ignored [Brightwell's] medical needs, and no provider has retaliated against him as he claims. His refusal to have labs done prevents his medical providers from assessing his current diabetes and kidney function, and it is unsafe to increase his pain medication without labs.  Because he has chronic kidney disease, the patient's kidneys are not as effective at clearing medications as healthy kidneys and he is at risk for Gabapentin toxicity. The patient has been educated numerous times on the risks of noncompliance, up to and including death, but he has remained noncompliant with his medical treatment plan.

ECF 22-2, at 17 ¶ 52.

## II.  PENDING MOTIONS

### C.    Non-Dispositive Motions

#### 1.    Motion for Injunctive Relief

Brightwell filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking an Order requiring Commissioner of Correction G. Morgan, Warden Robert S. Dean, Dr. Agonafir, and Dr. Temesgen to "immediately increase" his pain medication to "800 mg three (3)

times a day and immediately have the plaintiff take to have surgery done on his 'cat[a]ract' eyes."[10]
ECF 11.  Regarding his pain medication, Brightwell states that on September 11, 2023, Dr.
Agonafir renewed his prescription for 800 mg twice a day but Brightwell insists he should be
receiving it three times a day.  ECF 11-3, at 2 ¶ 12.  He claims that Dr. Agonafir changed the
prescription to "retaliate" against him, but he does not state why or how Dr. Agonafir's actions
were retaliatory.  Brightwell adds that "these defendants have the responsibility for providing [him]
the necessary medical care."  *Id.* at 3 ¶ 15.

A party seeking a preliminary injunction or temporary restraining order must establish the
following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering
irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the
party's favor; and (4) why the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council,
Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th
Cir. 2009).  "An injunction is a drastic and extraordinary remedy, which should not be granted as
a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also
SAS Inst., Inc. v. World Programming Lmtd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-
prong test is "a high bar, as it should be").

As to irreparable harm, the movant must show the harm to be "neither remote nor
speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Med. Grp.*, 952 F.2d

---

[10] As noted, Brightwell has another case in this Court concerning his claim that he is improperly
being denied cataract surgery.  *See Brightwell v. Kasahun, et al.*, Civ. No. BAH-23-3189 (D. Md.
2023 filed Nov. 29, 2023).  The Complaint filed in that case, which was erroneously docketed as
an amended complaint in this case, mentions care for his eyes and seeks an order compelling
defendants to take Plaintiff to an "outside independent eye [d]octor to do surgery on the plaintiff
as to "cat[a]ract" of the eyes . . ."  ECF 5, at 14.  However, since the eye issue is presently before
the Court in Civ. No. BAH-23-3189, the Court will address Brightwell's request for injunctive
relief in connection with the cataract surgery in that case.

802, 812 (4th Cir. 1991) (citation omitted).  In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances.  *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994) ("Indeed, intrusive and far-reaching federal judicial intervention in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so.").  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

The record before this Court establishes that Brightwell's pain care has been consistently managed by a team of health professionals who continue to provide Brightwell with pain medication despite Brightwell's refusal to assist in the monitoring of those medications.  Though Brightwell objects to the dosage, health care providers have explained the conditions precedent to any changes to his Gabapentin prescription and have frequently increased the dose on Brightwell's promise to comply with those conditions, only to be forced to reduce the dosage when Brightwell ultimately refused to comply.  As such, any risk of "irreparable harm" Brightwell faces is remedied through his compliance with simple health care directives, and the record before the Court provides no basis to shortcut that process, second-guess multiple medical care providers, and require a course of treatment that multiple doctors have warned may ultimately end Brightwell's life.  Nor does Brightwell establish that a preliminary injunction is in the public interest.  Moreover, for the reasons noted below, Brightwell is unlikely to succeed on the merits of the case.  Since there is no

basis for the injunctive relief requested regarding Brightwell's Gabapentin prescription, the motion is denied.

### 2.     Motion for Understanding

In this self-styled motion, Brightwell takes issue with ECF 10, this Court's Order directing service of documents on a YesCare, Inc. email address and on Thomas A. Smith, Senior Professional Liability Litigation Manager for Corizon.  ECF 13, at 1.  Brightwell also objects to the requirement that he pay an initial filing fee.  *Id.*  Brightwell states that he did not sue YesCare or Corizon and does not have enough money in his prison account to pay the filing fee as ordered.  *Id.* at 1–2.  He asks this Court to permit his case to proceed despite the fact that he cannot pay the filing fee, and he asks for an explanation as to why YesCare and Corizon's attorneys are being served.  *Id.*

To the extent that Brightwell does not have funds to pay the filing fee, this Court's Order only requires payments to be made when the balance of his account is *over* ten dollars.  ECF 10, at 2 ¶ 5.  Thus, the inability to pay the fee at this time is not a basis for dismissal of the complaint since no payments are required until Brightwell's account balance increases.

As to his request for an explanation of why Mr. Smith and YesCare were emailed documents, service of process in prisoner cases is governed by this Court's Standing Order 2012-01, Misc. No. 00-308, which states in pertinent part that

> [i]n an effort to reduce the costs and improve and expedite the process by which service of process is obtained in civil rights actions brought by prisoners, this Court – in cooperation with the Maryland Attorney General, various County Attorneys, and *private counsel representing . . . corporate health care providers* routinely involve in prisoner civil rights litigation – has devised a mechanism whereby counsel automatically accept service of process for, and enter an appearance on behalf of, those individuals and entities named in prisoner complaints.

Standing Order 2012-01, Misc. No. 00-308 (emphasis added).  The service address provided to the Court for YesCare and Corizon employees is the address where the Defendants in this case were served.

Assuming the above explanation has clarified the matters raised, Brightwell's motion shall be denied as moot.

### 3.     Motion to Seal

Counsel for the Attorney General's office filed a Motion to Seal Exhibit A of the Response to Show Cause Order stating that the medical records contained in the exhibit should be sealed due to privacy concerns.  ECF 19.  The records at issue have Brightwell's date of birth redacted from every page.  ECF 18-1.

Local Rule 105.11, which governs the sealing of all documents filed in the record, states in relevant part: "[a]ny motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection."  Rule 105.11 balances the public's common law right to inspect and copy judicial records and documents, *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), with competing interests that sometimes outweigh the public's right, *see In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).  The common-law presumptive right of access can only be rebutted by showing that countervailing interests heavily outweigh the public interest in access.  *Doe v. Public Citizen*, 749 F.3d 246, 265–66 (4th Cir. 2014).  The public's right of access to dispositive motions and the exhibits filed within is protected to an even higher standard by the First Amendment.  *See Rushford v. New Yorker Mag., Inc.,* 846 F.2d 249, 253 (4th Cir. 1988).  This right also "extends to a judicial opinion ruling on a summary judgment motion."

*Public Citizen*, 749 F.3d at 267.  The First Amendment's right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'"  *Id.* at 266 (citation omitted).  "[S]ensitive medical or personal identification information may be sealed," but not where "the scope of [the] request is too broad."  *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011).

The generalized ground of "privacy concerns" is insufficient to support the Motion to Seal.  This is particularly true where, as here, the records at issue do not have Brightwell's birthdate or other unique identifying information and are largely duplicative of the unsealed exhibits filed by Medical Defendants in support of ECF 22.  The Motion to Seal shall therefore be denied.

### 4.    Motion for Appointment of Counsel

Brightwell seeks appointment of counsel because he "can no longer see to read, etc. and the defendants counsel has sent a great deal to be read."  ECF 24.  In the alternative, Brightwell asks for a hearing wherein this Court can consider "continu[ing] the case until [Brightwell] is able to see to respond."  *Id.*

Brightwell's request for counsel will be denied.  Under 28 U.S.C. § 1915(e)(1), the Court has discretion to appoint counsel for indigent civil litigants in exceptional circumstances.  *See Bailey-El v. Hous. Auth. of Balt. City*, 185 F. Supp. 3d 661, 670 (D. Md. 2016) (citing *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975), *aff'd in part, vacated on other grounds,* 686 F. App'x 228 (4th Cir. 2017).  Whether exceptional circumstances exist is a fact-specific determination.  *See Whisenant v. Yaum*, 739 F.2d 160, 163 (4th Cir. 1984)*, abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989).  Exceptional circumstances exist where (1) "the plaintiff 'has a colorable claim'" and (2) "considering the claim's objective complexity and the plaintiff's subjective abilities, . . . the plaintiff 'lacks the capacity to present it.'"  *Jenkins v. Woodard*, ___ F.

4th ___, No. 22-6197, 2024 WL 3490967, at *4 (4th Cir. July 22, 2024) (quoting *Whisenant*, 739 at 162).

In *Jenkins*, the Fourth Circuit recently emphasized that in determining whether exceptional circumstances warrant appointment of counsel to a civil litigant, a district court should consider a litigant's carceral status, educational background, legal understanding, mental illness, and ability to access both legal research materials and evidence, as well as whether the case depends on the competing credibility of witnesses, who the pro se litigant would have difficulty cross-examining without the aid of a lawyer.  2024 WL 3490967, at *4.

Even assuming Brightwell presents colorable claims, appointment of counsel is nonetheless not warranted here.  Brightwell is, of course, incarcerated, which obviously makes it more difficult to litigate his case.  However, Brightwell is an experienced litigant who has shown ample ability to draft pleadings and raise arguments on his own despite being incarcerated.[11] While he notes impairments to his vision, he requests the alternative remedy of additional time to allow him to respond to dispositive motion filed by all Defendants.  Brightwell is clear that his request to have the Court appoint an attorney is directly related to his receipt of Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment (ECF 22).  That motion, and Brightwell's request for counsel, were filed months ago, providing ample time for Brightwell to read, digest, and respond to Defendants' motion.  Brightwell himself acknowledges that he received a copy of

---

[11] A cursory search of CM/ECF reveals that while incarcerated, Brightwell has filed and litigated dozens of federal lawsuits against numerous defendants in this Court.  *See, e.g.*, *Brightwell v. Vincent, et al.*, Civ. No. 08-1965-DKC (D. Md. filed July 24, 2008); *Brightwell v. Vincent, et al.*, Civ. No. 09-816-DKC (D. Md. filed Mar. 31, 2009); *Brightwell v. O'Malley, et al.*, Civ. No. 11-1652-DKC (D. Md. filed June 15, 2011); *Brightwell v. Warden of MCI-J, et al.*, Civ. No. 18-3807-RDB (D. Md. filed Dec. 11, 2018).  He has also litigated appeals in which his motions for counsel were summarily denied.  *See Brightwell v. Vincent*, 404 F. App'x 780 (4th Cir. 2010);  *Brightwell v. Gang*, No. 21-7751, 2022 WL 2901726, at *1 (4th Cir. July 22, 2022).

the docket sheet from Clerk's Office on April 2, 2024, and thus has unquestionably been aware of all pending motions for nearly four months.  ECF 25, at 1.  As such, his own proposed alternative remedy—an extension of time to review Defendants' filings—has effectively been granted by the passage of time.

Regardless, in the months following this request, Brightwell did not file a response to the motion to dismiss or request any extensions.  He did, however, choose to draft and file a motion seeking sanctions for Defendants alleged failure to provide him with notice of certain filings.  *Id.* at 2.  Despite his asserted difficulty reading, each of his filings in this case are neatly typed and each articulates his position clearly.  Indeed, Brightwell's request for counsel in this case notes only that he needs help reviewing documents and makes no mention of requiring assistance in legal tasks like drafting filings or researching arguments.  ECF 24, at 1 (seeking the appointment of counsel "because [Brightwell] can no longer see to read").  Brightwell makes no allegations of cognitive limitations that would impede the ability to present his case.  This case is one that appears to hinge on the unimpeached veracity of medical records drafted by Defendants prior to the filing of this lawsuit, nor the eyewitness testimony of potentially biased witnesses whose recollections and alleged observations are best challenged with the assistance of competent counsel.  Finally, Brightwell's clam is not particularly complex.  Accordingly, even after *Jenkins*, no exceptional circumstances exist that warrant the appointment of an attorney to represent Brightwell under § 1915(e)(1) and the motion is denied.

### 5.    Motion for Sanctions

Brightwell states that he requested (and received) docket sheets from the Clerk of this Court for the instant case and for Civil Action BAH-23-3189.  ECF 25, at 1.  He takes issue with the fact that the Attorney General's Office allegedly sought to seal an exhibit in this case and that this Court

granted an extension of time to the defendants to file a response in Civil Action BAH-23-3189. *Id.* Brightwell claims that the Attorney General's Office is supposed to keep him aware of its filings via certificates of service but intentionally has not done so, thus warranting sanctions. *Id.*

Brightwell's first complaint of alleged misconduct is unrelated to the case at bar.[12] ECF 25, at 1–2 (complaining about an extension granted in BAH-23-3189). That allegation of misconduct, though meritless on its face, is better addressed in that case. As to the claim that the Attorney General's Office failed to provide him with notice of a filing, namely the motion to seal found at ECF 19, Brightwell fails to explain why such a failure merits a sanction. Federal Rule of Civil Procedure 11(c)(1) permits this Court to "impose an appropriate sanction on any attorney, law firm, or party that violated [a] rule or is responsible for [a] violation." Additionally, "[a] sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. Proc. 11(c)(4). Counsel for DPSCS certified that a copy of the Motion to Seal was mailed to Mr. Brightwell on January 4, 2024. ECF 19, at 2. It is possible that the mailing was not delivered through no fault of counsel. In fact, since Brightwell makes no allegation that he did not receive other filings in this case, an innocent explanation of misdelivered mail seems far more plausible than Brightwell's claim that the document was intentionally kept from him. Moreover, even if it is true that counsel failed to provide Brightwell with the filing, such a misstep is best cured by a reminder to counsel to send Brightwell copies of all filings made in the case. While a self-represented pleading is not subjected to the same scrutiny as one drafted by an attorney, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007),

---

[12] Brightwell appears to imply nefarious intent on the Attorney General's failure to send documents (and in their request for deadline extensions) because of the fact that he was previously prosecuted by the State's Attorney of Somerset County and some defendants in BAH-23-3189 are presently represented by the Office of the Attorney General. ECF 25, at 2. However, he fails to explain the relevance of this alleged correlation.

Brightwell has failed to substantiate a violation of a rule of this Court and has not made the case for sanctions.  The Motion for Sanctions is denied.

**D.    Dispositive Motion**

**1.    Standard of Review[13]**

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

---

[13] Medical Defendants move for dismissal or for summary judgment.  A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty*., 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd* 684 F.3d 462 (4th Cir. 2012).  Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment.  *See Laughlin v. Metro. Washington Airports Auth*., 149 F.3d 253, 260–61 (4th Cir. 1998).  When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also* W*illey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).  As such, save for any claims sounding in the First and Fourth Amendment, *see infra* note 14, Defendants' dispositive submission will be treated as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered.

that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## 2. Analysis

The Complaint essentially alleges that Brightwell received inadequate medical treatment constituting a violation of his Eighth Amendment right to be free from cruel and unusual punishment.[14]  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by

---

[14] Brightwell's complaint actually alleges violations of "the First, Fifth, Eighth, Fourteenth etc., Amendment[s] of the United States Constitution."  ECF 1, at 1.  The Court will "liberally construe" the complaint because Brightwell, though quite experienced in federal litigation, proceeds pro se. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  But "even a pro se complaint must be dismissed if it does not allege a 'plausible claim for relief.'" *Forquer v. Schlee*, Civ. No. RDB-12-969, 2012 WL 6087491, at *3 (D. Md. Dec. 4, 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Brightwell makes no effort to support the bald allegation that the conduct alleged in the complaint violates the First or Fourth Amendments, and similarly fails to narrow down the wide variety of possible claims that might stand under the "etc." umbrella.  "District judges are not mind readers," and "[e]ven in the case of pro se litigants, they cannot be expected to construct full blown claims from sentence fragments[.]" *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  Thus, while the Court must give Brightwell leniency, there is no requirement that it "conjure up questions never squarely presented to [it]." *Id.*  Any allegations raised under the First or Fourth Amendments are dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  The Court construes Brightwell's reference to the Fourteenth Amendment as one noting the incorporation of the Bill of Rights to the states because Brightwell is not held pre-trial and therefore any allegation of "cruel and unusual punishment" should be addressed under the Eighth Amendment. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process

virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.  "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."  *Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or failed to ensure that the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for

---

Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" to pretrial detainees "who require it") (citation omitted).

a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or, as appears to be alleged here, failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Objectively, Brightwell's chronic pain syndrome is a serious medical need inasmuch as medical providers have repeatedly acknowledged and prescribed treatment for the condition. However, the undisputed facts before the Court demonstrate that Brightwell's pain medication was reduced in dosage only because he refused to have his blood drawn for the very legitimate purpose

of checking his kidney function.  Brightwell admits as much to his providers, but claims that his reluctance to allow for his blood to be drawn is due to his concern that it will expose him to the COVID-19 virus and because he does not trust medical staff to perform the required tests.  Thus, stated differently, Brightwell's lawsuit rests on the premise that Defendants should be ordered to provide care that they know carries a substantial risk of serious harm (or death) to Brightwell.  Far from failing to address a serious medical need, this case presents the nearly opposite scenario where a plaintiff demands care that, if provided, "would result in further significant injury or unnecessary and wanton infliction of pain . . . ." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (citing *Gayton v. McKoy*, 593 F.3d 610, 620 (7th Cir. 2010)).  Summary judgment is warranted on that basis alone.

Moreover, the record before the Court reflects that medical staff have repeatedly tried to explain to Brightwell that because the last blood work he provided showed a decrease in kidney function, it is simply not safe for him to continue taking Gabapentin at the requested dose without additional testing confirming his kidney function has not worsened.  Thus, subjectively, Defendants have not deliberately denied Brightwell beneficial medical treatment.  Rather, they have repeatedly attempted to ensure that Brightwell will not be harmed by the medication prescribed.  At worst, this amounts to a disagreement with the medical care providers that cannot form the basis for an Eight Amendment claim.[15]  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless

---

[15] Similarly, the disagreement over the validity of concerns about Brightwell's mental health or his apparent disagreement with his diagnoses fails to rise to the level of an Eighth Amendment violation as both represent a straightforward disagreement over care and this case presents no allegations of special circumstances sufficient to alter that analysis.

exceptional circumstances are alleged."); *accord Jackson*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). There are no exceptional circumstances alleged in this case and Defendants are entitled to judgment in their favor on Brightwell's Eighth Amendment claims. The remainder of Brightwell's constitutional claims are dismissed with prejudice. *See supra* note 14.

Brightwell's negligence claims, sounding in state law, are dismissed without prejudice. This Court has original subject matter jurisdiction over any federal claim, pursuant to 28 U.S.C. § 1331(a)(1), which "confers upon district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'" *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012). However, the Court does not have original jurisdiction over Brightwell's state law claims, and so the Court is only authorized to resolve those claims pursuant to the grant of supplemental jurisdiction in 28 U.S.C. § 1367(a), which provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Pursuant to § 1367(c)(3), however, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." "[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995); *see also ESAB Grp.*, 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."). "[U]nder the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the

conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." *Hinson v. Norwest Fin. S. Carolina, Inc*., 239 F.3d 611, 616 (4th Cir. 2001).  In the absence of viable claims that come within federal question jurisdiction, the Court exercises its discretion and declines to exercise supplemental jurisdiction over Brightwell's state law negligence claims.  Therefore, the Maryland law claims are dismissed, without prejudice to Brightwell's right to pursue such claims in the appropriate state court.

## III.    CONCLUSION

For the reasons stated and by separate Order which follows, Medical Defendants' Motion to Dismiss or for Summary Judgment, construed primarily as one for summary judgment, shall be granted and judgment entered in their favor as to Brightwell's Eighth Amendment claims.  The remainder of his constitutional claims are dismissed with prejudice.  Brightwell's state negligence claims are dismissed without prejudice.  All remaining motions shall be denied.


 July 31, 2024_____                        _____/s/_____
Date                                         Brendan A. Hurson
                                             United States District Judge